## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

CHRISTOPHER COX,                        )
                                        )
        Plaintiff,                      )
                                        )        Civil Action No:
v.                                      )        4:23-cv-00284-WMR-WEJ
                                        )
The CITY OF CALHOUN, and                )
LEONARD NESBITT, PAUL                   )
WORLEY,  and TERRY MILLS,               )
in their Official and Individual        )
Capacities,                             )
                                        )
        Defendants.                     )

## PLAINTIFF'S MOTION TO STRIKE DEFENDANTS' ANSWERS AND ENTER DEFAULT JUDGMENT AND MEMORANDUM OF LAW

COMES NOW Plaintiff Christopher Cox and moves the Court to strike Defendants' Answers and enter Default Judgment for Defendants' suppression and fabrication of key evidence, attempting to influence witnesses, obstruction of justice, perjury, and other improper conduct. In support, Plaintiff shows as follows:

## I.      INTRODUCTION.

On December 2, 2022, Plaintiff Christopher Cox reported to City of Calhoun City Administrator Paul Worley that a Calhoun citizen told Cox that Fire Department Battalion Chief Roger Smith, a married male in his fifties, had been engaged in an improper relationship of a sexual nature with a then seventeen-year-old waitress at a local restaurant, including, *inter alia*, requesting nude pictures. Cox reported that this information had been previously provided to Fire Chief Leonard Nesbitt and Deputy Fire Chief Terry Mills, and since neither Worley nor any other city official

1

knew of it, then Nesbitt and/or Mills must have improperly quashed the serious complaint. At the conclusion of the meeting, Worley, instead of addressing the serious allegations of sexual misconduct against a minor, immediately communicated with the city attorney his suspicion that Cox made the allegations to hurt Nesbitt, Mills and the City because Cox had failed in a grievance he had filed on July 26, 2022. Then, only ten days later, on December 12, 2022, Cox was terminated for allegedly 'violating the chain of command' in reporting Smith's sexual misconduct with a minor, among other things. Meanwhile, on December 8, 2022, Smith was given a two-day suspension and probation by Worley, Nesbitt and Mills.[1]

What discovery has shown is that following Cox's December 2, 2022 meeting with Worley, the City's sole aim was justifying Cox's termination of employment. The Defendants' actions have included serious instances of misconduct, beginning at the Appeal Hearing for Cox's termination and continuing throughout discovery in the instant case. These abuses included the following: withholding critical documents from the Hearing Examiner and testifying falsely because the documents were not produced at the hearing, fabricating disciplinary records, intentionally

---

[1] Roger Smith ultimately resigned under pressure on December 20, 2020. (Ex. 1, Smith Resignation). He did so only after the City was forced to read the text messages he sent to the 17-year-old female and his texts became public. (Ex. 2, Dep. of R. Smith, pp. 57-58).

withholding critical text messages requested in discovery, threatening witnesses, obstructing justice, instructing witnesses to destroy evidence and to testify falsely, and testifying falsely. As difficult as it is to consider, this misconduct has all occurred in this case at the hands of public officials.[2]

While Plaintiff understands the gravity of this motion, the behavior of these Defendants is beyond the pale. Plaintiff respectfully requests that Defendants' Answers be stricken, and that Default Judgment be entered against them.

## II.    **STATEMENT OF FACTS.**[3]

### A.    **Failure to Produce Subpoenaed Documents at the Appeal Hearing and False/Incorrect Material Testimony.**

In preparation for the administrative Appeal Hearing regarding Cox's termination, on January 11, 2023, counsel for Plaintiff submitted an open records request to the City requesting, "Any and all documents related to any investigation of Roger Smith by the City of Calhoun Police Department or any other division of the City of Calhoun, including but not limited to any investigation related to allegations of sexual misconduct and/or other illegal conduct…." (Ex. 4, Open Records Request). Two days later, on January 13, 2023, Hearing Examiner William

---

[2] Apparently, and according to media reports, Chief Nesbitt and Deputy Chief Mills were placed on administrative leave shortly after the City's 30(b)(6) deposition, which took place on August 8, 2025.  (Ex. 3, Newspaper Article).

[3] Plaintiff has attempted to place these various acts in chronological order as they occurred in the case.

Thompson issued subpoenas to Worley and the Calhoun Police Department directing that they produce at the hearing the same documents requested in the open records request. (Ex. 5, Subpoenas).

Worley and Calhoun Police Chief Pyle both testified at the hearing, and neither produced nor referenced a police report regarding Smith. However, a police report did exist, which was not produced until April 21, 2025, <u>more than two years later and the night before Pyle's deposition</u>. (Ex. 6, Email Producing Police Report). The police report summarized an interview between Calhoun police detectives and informant Tammy Evans which took place on December 5, 2022 (seven days before Cox was terminated), which included the detective's review of an audio recording between Evans and the minor. The police noted:

> During the recording, you could here [her] state that Mr. Smith had her park at the old building beside the fire hall and he came to her car and got it. [She] then stated that while visiting with Mr. Smith he kissed the back of her neck and touched her breast area. [She] stated that when Mr. Smith touched her breast, he asked if she needed to be checked for breast cancer. [She] stated that Mr. Smith had asked for photos, however she did not send any because it would be child pornography.

(Ex. 7, Police Report).

> After listening to the recording, Ms. Evans asked what she should do in reference to Mr. Smith having [the minor] at the fire hall. Ms. Evans advised that she contacted Mr. Courtney Taylor with Emergency Management. Ms. Evans advised that she then contacted Mr. Chris Cox with the fire department and advised him of the situation.

4

(Ex. 7, Police Report).[4]

One of the primary reasons Cox was terminated, *according to the City*, was that he allegedly grossly and recklessly made-up false allegations against Smith as well as against Nesbitt and Mills in his meeting with Worley on December 2, 2022. (Ex. 8, Termination Notice). Without the police report in evidence, Worley characterized the police investigation and what Cox told him in their December 2, 2022 meeting as follows:

> Q.    And what were the results of that investigation that [Chief Pyle] reported back to you?
>
> A.    He reported back that after looking into it, the detectives found that there was no criminal activity involved that was presented to them from the informant. There was some additional -- there were some details that the investigation produced that corroborated some of Mr. Cox's statement but more along the lines of the informant stating that the waitress had met Mr. Smith at Station 1 or in close proximity to Station 1 and that there was, in fact, messages between Mr. Smith and the waitress, but no criminal activity had been identified by the detectives.
>
> Q.    They didn't report back any inappropriate photographs being communicated back and forth as provided by the --
>
> A.    No, sir
>
> ***
>
> Q.    Okay. What was your belief, then, at that point regarding the original nature of what had come in?
>
> A.    **I believe, at that point, it was obvious to me that there were false statements, false accusations against not only Mr. Smith, but the very bold accusations against the chief and deputy chief that they were fully aware of the situation and had chosen to bury it because of the friendship between them and Mr. Smith**.

---

[4] Despite the elicitation of pornography of a minor, which is a federal felony pursuant to 18 U.S. Code 2251, Lt. Commander Printup and Det. Wilkerson concluded, "At the time of the report, no criminal actions had occurred." (Ex. 7, Police Report). The police never questioned Smith.

(Ex. 9, Appeal Hearing, pp. 20-21, 28-29).

The police report was not produced for another two years, but after it was, and in August 2025, Worley, now as 30(b)(b)(6) designee for the City, admitted that the information contained in the report was "very similar" to what Cox reported directly to him on December 2, 2022. (Ex. 10, 30(b)(6) Dep. of City of Calhoun, p. 93). Worley claimed to have relied on an oral report from the Calhoun Police Chief and had never compared Cox's story to the story written by his own police department. Nonetheless, it represents a shocking reversal in testimony.[5] Worley's previous testimony that it was "obvious to [him] that there were false statements," from Cox, led directly to the Hearing Examiner concluding on March 2, 2023, that "<u>There is no question that the allegations made by Cox to Worley were false and this examiner is left with no doubt that those allegations were recklessly false</u>." (Ex. 9, Appeal Hearing, p. 29; Ex. 12, Decision of Examiner, p. 15) (emphasis added). The use of this testimony did not stop there. Defendants filed a Motion for Judgment on the Pleadings, requesting that this Court enter judgment against Mr. Cox in part based on the conclusion that Mr. Cox's allegations were recklessly false. (Doc. 25). Had

---

[5] Worley contended at his personal deposition on February 26, 2025, approximately two months before the police report was produced in discovery, that he was unaware as to whether any written report existed from the Calhoun Police Department concerning the investigation of Roger Smith. Worley testified, "I would assume there would be a written report by the investigators." (Ex. 11, Dep. of P. Worley, p. 89-90). No document was produced until April 21, 2025.

this Court granted Defendants' motion, none of this would ever have been brought to light, as the police report which is consistent with Cox's allegations would never have been discovered. Defendants never sought to correct the Court's record.[6] The breadth and consequence of withholding the document and the concomitant testimony is staggering, all of which became apparent after the City was forced to admit that Cox's story was truthful and consistent with their own police investigation.

**B.    Defendants Created False Disciplinary Reports and Then Testified Falsely about the Fabricated Records.**

Before the Appeal Hearing, Plaintiff also requested "The personnel file for Christopher Cox from the City of Calhoun Fire Department and/or City of Calhoun," and, "Any and all emails, text messages, letters, memoranda, statements, correspondence or other documents from or to Lenny Nesbitt, Terry Mills, Roger Smith, Paul Worley and/or Tammie/Tammy Evans regarding … alleged insubordination and/or any other impermissible level of conduct by Christopher Cox." (Ex. 3, Open Records Request) (Ex. 4, Subpoenas). The City produced prior to the hearing one (1) verbal reprimand against Cox dated July 19, 2022. (Ex. 13, Verbal Reprimand Form).

---

[6] Had the District Court followed the Report and Recommendation of the Magistrate in total, none of this would have come to light.

On June 21, 2024, in response to Plaintiff's written document requests in the instant case, which included a request for Cox's personnel file, the City produced seven additional disciplinary actions: a verbal reprimand dated July 8, 2020, a verbal reprimand dated March 29, 2021, a verbal counseling dated August 10, 2021, a verbal counseling dated May 12, 2022, a verbal reprimand dated May 31, 2022, a verbal counseling dated July 19, 2022, and a verbal reprimand dated August 1, 2022. (Ex. 14, Verbal Counseling and Verbal Reprimand Forms).

On June 17, 2025, Cox served his Fourth Requests for Production of Documents, requesting the metadata for the disciplinary forms. On August 1, 2025, Defendants produced the documents in native format. (Ex. 15, Pl.'s 4th Req. for Prod.). The metadata confirmed why the disciplinary forms had not been produced prior to the Appeal Hearing: <u>the documents did not exist at that time but rather were fabricated and backdated by Nesbitt (or on his computer) on the afternoon of April 4, 2024</u>. The metadata indicates that the verbal reprimand dated July 8, 2020, was created on April 4, 2024, at 2:01 pm. (Ex. 16, Affidavit of L. Harley, ¶ 6) (Ex. 17, Screenshots of Metadata). The metadata indicates the author as Nesbitt, which means that either Nesbitt created it or someone using his computer did. (Ex. 16, Affidavit of L. Harley, ¶ 6). The metadata indicates the document was last printed on November 1, 2012, at 9:27 am. (<u>Id.</u>). This means that another document which was last printed at that time was copied and pasted into a new Word document which

was used to create the document first saved as the July 8, 2020, verbal reprimand on April 4, 2024. (Id.).

The verbal reprimand dated March 29, 2021, was created on April 4, 2024, at 12:58 pm, from the same template last printed in 2012. (Id., ¶ 7). The verbal counseling dated August 10, 2021, was created on April 4, 2024, at 1:10 pm, from a template last printed that same day eleven minutes earlier. (Id., ¶ 8). The verbal counseling dated May 12, 2022, was created on April 4, 2024, at 12:17 pm, from the same template last printed in 2012. (Id., ¶ 9). The verbal reprimand dated May 31, 2022, was created on April 4, 2024, at 12:29 pm, from the same template last printed in 2012. (Id., ¶ 10). The verbal counseling dated July 19, 2022, was created on April 4, 2024, at 12:44 pm, from the same template last printed in 2012. (Id., ¶ 11). The verbal reprimand dated August 1, 2022, was created on April 4, 2024, at 3:09 pm from a template last printed that same day less than an hour before. (Id., ¶ 12).

The documents that were fabricated on April 4, 2024, by Nesbitt and/or Mills, were then produced to Plaintiff less than two months later, and Defendants testified about and sought to utilize the fabricated evidence to support their case. Nesbitt testified that the disciplinary forms were created on or around the dates of the incidents referenced, and Mills testified that he reported many of the incidents to Chief Nesbitt, and that they would have made the decisions to reprimand together. (Ex. 18, Dep. of L. Nesbitt, pp. 17-20; Ex. 19, Dep. of T. Mills, pp. 107-115).

Defendants cited Cox's alleged multiple disciplinary problems as reason for his termination at the Appeal Hearing and throughout this case. (Ex. 8, Termination Notice); (Ex. 11, Dep. of P. Worley, p. 94, 98-99, 117-120, 124, 133, 142); (Ex. 18, Dep. of L. Nesbitt, p. 119); (Ex. 9, Appeal Hearing, p. 37 (Worley Testimony), p. 144 (Mills Testimony)).

### C.    Perjury by Deputy Chief Mills and the Intentional Withholding of Key Documents Requested in Discovery.

Plaintiff's theory has always been that Nesbitt, Mills and Smith were good friends who were looking out for one another. Plaintiff requested the production of all communications between Mills and Smith, including all communications regarding this case. (Ex. 20, Pl.'s 3rd Req. for Prod. - "1. Copies of all emails, text messages (whether to or from a personal phone or a business phone), letters, correspondence and any other written communications between Terry Mills and Roger Smith, from January 1, 2021, to the present.") (Ex. 15, Pl.'s 4th Req. for Prod. - "5. Any and all text messages or emails sent to or from any Defendant in this case concerning Christopher Cox or this case which have not previously been produced in discovery, from January 1, 2012, through the present.")). Defendants did not produce any texts between Mills and Smith.

Mills testified on February 25, 2025, that although he was friends with Smith in years past, they were no longer even acquaintances after the incident involving the seventeen year old girl. (Ex. 19, Dep. of T. Mills, pp. 59-60 (Q. "When did you

stop being his friend?" A. "Stopped being acquaintances when all of this transpired."

Q. "All of this being the end of 2022 when he had eventually resigned?" A. "Yes.").

Smith was deposed on August 1, 2025, and he produced multiple documents, including previously unproduced texts with Mills.[7] The texts revealed Mills perjured himself regarding the status of his relationship with Smith, and that he had failed to produce text messages which would have proven their ongoing relationship. Samples of the texts from May and August, 2024, are as follows:

| | |
|---|---|
| Smith: | How's things going with you? |
| Mills: | Good except for your best friend dragging us through the mud with this lawsuit I'm about to the point I don't care may as well not because people are gonna think what they want to about you anyway |
| *** | |
| Smith: | Holy hell, I read that law suit! I'm ready to just kill myself! I deserve to be living. Lol. There sure is a lot of Fluff in his accusations. I guess me and you are the only two womanizers that place has seen. All those flirty girls, are just victims!! Lol. Call me sometime. *don't . . . |
| *** | |
| Smith: | They all quit too???? |
| Mills: | Yep Since you left all of them Chad Greeson, JIM chance Colette Hawkins |
| Smith: | I guess Lenny is gonna be there until Eddie Brannon comes for him. Lol |
| Mills: | I think so |
| Smith: | How's the strippers in Dallas??? |
| Mills: | Not very good Miami was much better. |

(Ex. 21, *Mills – Smith Text Messages Produced by Smith*)(*sic*).

---

[7] Plaintiff's counsel was allowed to image Smith's phone screen at the deposition showing the text messages. Plaintiff has attached those as Ex. 21.

**D.**    **<u>Chief Nesbitt's Subornation of Perjury and Obstruction of Justice</u>.**

On June 17, 2025, Plaintiff deposed Courtney Taylor, the witness who reported Smith's misconduct to Nesbitt on October 19, 2022, after learning of it from Tammy Evans. (Ex. 22, Dep. of C. Taylor, p. 16). Evans informed Taylor that Smith was sleeping with a 17-year-old or trying to get her to come to the fire station to have sex. She told him it was all documented in texts. (<u>Id.</u>, pp. 18-19). She sent the texts to Taylor, who reviewed them and discussed them with Nesbitt the next day. (<u>Id.</u>, pp. 21, 27-31). Nesbitt informed Taylor that he did not want the texts, and Taylor replied that he therefore would delete them:

> Q.    When did you delete the text messages?
> A.    I deleted them the day after I got them in the morning.
> …
> A.    I called Chief Nesbitt on the phone and cell phone to cell phone and asked him – told him I needed to talk to him and could he meet with me.… And so I don't remember if he said go to the City park which is right here across the road or if I said meet me at the City park. So we met down there. Backed in with each other door to door or I backed in and he pulled in. So I explained the whole situation to him, told him what I'd saw, told him what Tammy had said.… And I told him about the things she had said during the conversation and what I had saw. I mean probably not everything I'd saw in the text. But I know I mentioned the part about him trying to get her to come to the fire department because, to me, that was way over the top. I'm -- well, sorry. That's my opinion. Sorry.
> Q.    That's fine. So did you tell him that she was 17 years old?
> A.    I did.
> …
> Q.    Did you tell him that the -- that Roger Smith was trying to get her to come to the fire house to have sex or to engage in some sexual act?
> A.    I told him she was trying to get her to come to the fire department, yes, and that they had talked sexually.…

Q.      So you told Chief Nesbitt that Roger Smith had sent sexual -- texts of a sexual nature to the 17-year-old girl?

A.      Yes.

Q.      And he was pursuing her?

A.      Yes.

Q.      And you told him you read the texts, correct?

A.      I'm sure I did, yes, ma'am.

Q.      Did you offer to give them to him?

A.      I don't remember if I offered to give them to him. But I know I said -- that's when I deleted them right after I left. Because I know I made the statement that, well, if you don't want these, then I'm getting rid of them. And I know he didn't want them or I wouldn't have got rid of them. So I don't know if I offered -- I don't know if I said do you want me to send these to you or not. But I let him know I was going to get rid of them because I didn't want them on my phone.

Q.      So you said the words -- you don't recall exactly what came before, but you said the words if you don't want these, I'm going to delete them?

A.      Yes.

Q.      And what did he say?

A.      He said I don't want them.

(Id., pp. 26-32).

Not only did Nesbitt fail to preserve this obviously critical evidence, Nesbitt, on June 8, 2025, attempted to improperly influence Taylor's testimony via text before Taylor's deposition the following week in this case:

Hey buddy. Two things, first I'm just checking on you about your surgery and hope all is good. You need anything just let me know. Second I know you have a deposition coming. I'm just clarifying that as I said that you did not give me anything other than verbal information. Also that you didn't give me any names of people just info about Roger and that the person that told you did not want to talk with me or Terry. Not putting words in your mouth. Just saying what you said to me. Please don't say that we spoke about this and delete this text. We will talk after this is done and about all the untrue things he is making up. Thanks and call if you need anything. We didn't talk and delete this please.

13

(Id., p. 52; Ex. 23, Text).[8]

Perhaps most disturbing is Nesbitt knew if Taylor told the truth that it would be devastating for Nesbitt's and the City's defenses. Nesbitt testified in his deposition that Taylor never offered him the text messages, that Taylor never told him the name of the girl, and that Taylor either never told him the name of the informant or told him the informant refused to talk with him – all of which was designed to make it appear reasonable for Nesbitt to have not done any legitimate investigation when he was informed of Smith's improper behavior in October. (Ex. 18, Dep. of L. Nesbitt, p. 33, 51, 107). When confronted with the overwhelming evidence demonstrating Nesbitt likely perjured himself and obstructed justice, the City testified that Courtney Taylor is a good, upstanding human being who has served his community for a long time. (Ex. 10, 30(b)(6) Dep. of City of Calhoun, p. 128-129).

### E.    **Threats to Retaliate Against Fire Department Employee Witnesses.**

On April 22, 2025, Plaintiff deposed Todd Holbert, one of three Battalion Chiefs for the City of Calhoun Fire Department. Holbert testified:

A.    **But it was kind of laid out there, what was told to me, whoever -- whoever testified, might not go so great for them.**

---

[8] This text which was responsive to Plaintiff's request for "Any communications with or between Courtney Taylor, Defendant Nesbitt, Defendants Mills, and Defendant Worley about Roger Smith concerning .. any allegation in Plaintiff's Complaint," was only produced because Mr. Taylor brought it to defense counsel's attention. (Ex. 24, Pl's 1st Req. for Prod, No. 33) (Ex. 22, Dep. of C. Taylor, p. 50).

Q.    And Deputy Chief Mills said this to you?

A.    Yes, ma'am.

Q.    And can you try to recall his exact words, please?

A.    Those were the words.

Q.    **He said to you whoever testified in this lawsuit, it might not go so well for them?**

A.    **Yes.**

Q.    What did you understand him to mean?

A.    I mean your imagination runs wild then. I mean it's just, you know, nothing. I mean it could mean a lot of things, I guess. This – so I -- I don't know.

Q.    **Did you take that as a threat to your job?**

A.    **I took it as, you know, to anyone. Not just me.**

Q.    **So you or anyone who testified favorably for Chris could lose their job?**

A.    **Yes, I took it that way….**

Q.    Okay. What else did he say?

A.    That was it. He said not by me. Because I asked him what does that mean. He said, Well, not by me. I don't know….

Q.    Was he -- did you take -- did you think he meant that Chief Nesbitt could retaliate?

A.    I didn't know if he meant by Chief Nesbitt or the City….

Q.    Who did you share it with?

A.    I shared it with my guys when I came walking in the bedroom and they asked me what was wrong because they could see I was agitated, and I told them what had happened….

Q.    And do you think it was in 2023 when this conversation happened?

A.    It was March 28th of 2024.

Q.    Why do you know that date exactly?

A.    Because I noted it in my phone….

Q.    Would you kindly read the note you made on March 28, 2024 after your conversation with Deputy Chief Mills?

A.    Terry said that anyone that testified would not work out well for them.

(Ex. 25, Dep. of T. Holbert, pp. 109-112; Ex. 26, March 28, 2024, Note) (emphasis added). Former Calhoun firefighter Chad Castoe also signed a Declaration stating, "In approximately March 2024, I witnessed Todd Holbert, who was my Battalion

15

Chief at the time, come out of Deputy Chief Terry Mills' office with a shocked and shaken look on his face…. He stated that Terry Mills had just told him that if anyone testified in Chris Cox's lawsuit 'it would not go well for them.'" (Ex. 27, Declaration of C. Castoe, ¶¶ 14-15). Castoe further declared, "Todd Holbert appeared very upset and worried about these statements. He stated he perceived these comments as a threat or warning…. These threats quickly spread throughout the fire station on C shift, and I heard several fire fighters on C shift discussing them that day an on other occasions." (Id., ¶¶ 17, 20).

**F.     The City of Calhoun's 30(b)(6) Deposition Reveals the Depth of the Misconduct.**

The City of Calhoun was deposed on August 8, 2025, through its corporate designee, Paul Worley.[9] He agreed that in a situation involving an employee's termination, the employee's personnel file is of particular importance. (Ex. 10, 30(b)(6) Dep. of City of Calhoun, pp. 19-21). He agreed that Cox did not have a full copy of his personnel file at the time of the Appeal Hearing. (Id. at p. 27). He agreed that it would be wrong for someone in Nesbitt's position to create reprimands years after the date on the reprimand. (Id. at p. 42). He agreed it would be inappropriate if Mills failed to produce his communications with Smith and was dishonest regarding the nature of their relationship. (Id. at 48-49). It also would be wrong for Mills to

---

[9] Worley had previously testified at the administrative hearing and by deposition for this case in his personal capacity.

seek to influence the testimony of witnesses, including subordinate firefighters. Although the City was aware of Todd Holbert's testimony that this had occurred, Worley agreed the City had done nothing to investigate it. (Id. at p. 50).[10]

Furthermore, he agreed that Nesbitt and Mills' "investigation" of Smith was insufficient, testifying, "Given the information that they had, I would have much preferred them go beyond that and share that information with me at the time… [I]t was disappointing to me that they didn't make me aware of it at the time." (Id. at pp. 52-53). Worley, as designee, further testified:

> Q.   And you can acknowledge now, can you not, Mr. Worley, on behalf of the City, that it was a failure to not get to the bottom of this in October of 2022. Correct?
> A.   I'm sure it was a failure…. I wish it would have been handled immediately in October.

(Id., at p. 66).

> Q.   [Chris Cox] told you there's possible criminal activity. True?
> A.   Yes.
> Q.   And he told you that possibly that criminal activity included him touching a 17-year-old girl in a sexual nature. True?
> A.   True.
> Q.   And he told you that there might be child pornography. True?
> A.   … I don't think he used the words "child pornography." But I know he said that there were pictures involved, very inappropriate pictures.
> Q.   Okay. Inappropriate pictures. True?
> A.   And possibly nude photographs between the two.
> Q.   And that there were text messages that would evidence all of that. True?
> A.   True.

---

[10] The City testified that there was an investigation being performed by outside counsel into the allegations relating to Nesbitt's text message to Taylor. (Id., at pp. 99-100).

Q.     And every bit of what he said in that meeting with you was true, according to this report?

A.     According to his accusations against Roger Smith. But what he told me, his accusations against the chief and deputy chief, were not true.

Q.     Okay. But what I said about -- what he said about what Roger Smith was up to, according to the Calhoun Police Department, what Chris Cox told you was true?

A.     I would say it was very similar.

Q.     Okay. And he also told you that he knew or heard that the chief and deputy chief had known about this since October of 2022 and nothing had happened to Roger Smith. True?

A.     I don't know if he used that date of October of '22, but he did say that they knew all about this, had the information, had the evidence, and had chosen to bury it.

Q.     He told you that the chief and deputy chief had known about this for a good period of time, including up to months, and nothing had happened to Roger Smith. True?

A.     Again, I don't know if a timeline was used but true, yes.

(Id., pp. 92-94). Worley testified:

Q.     Did you consider, Mr. Worley, when you were writing this letter, that maybe it was the leadership that may have been wrong here, that Chief Nesbitt and Deputy Chief Mills might be the problem, that they're running it like Boss Hogg, covering stuff up, looking out for their friend who's having an awful, God awful, morally repugnant relationship with a high school student? Did you consider that?

A.     No.

Q.     Do you think you ought to have?

A.     Knowing what I know now and Monday morning quarterbacking it, there's definitely concern.

Q.     Yeah. I mean, that's right. We all live and learn. But you should have -- I mean – because it can go one of two ways. It can be this man's fault, or it may be them. True? It could be --

A.     Fault --

Q.     Yeah. It could be Nesbitt and Mills running the fire department in a way they shouldn't. True?

A.     That's a possibility, yes.

(<u>Id.</u>, pp. 129-130).[11]

In sum, when faced with the overwhelming evidence of misconduct, including the fire leadership's and City's failure to report and properly investigate the allegations against Smith, Worley admitted on behalf of the City that its leadership may indeed have been the problem, not Chris Cox – a complete reversal of previous testimony that collapses the City's entire theory for terminating Cox. Yet, these epiphanies of truth are "too little too late." It took two years, too many man-hours and substantial legal fees to jar this information loose from Defendants.[12] Plaintiff should have known this information since the Appeal Hearing, especially considering Cox's livelihood was on the line. Defendants' actions constitute a concerted and ongoing effort to defraud not only Plaintiff, but also the Court.

## II.    <u>ARGUMENT AND CITATION OF AUTHORITY</u>.

### A.    <u>This Court Should Sanction Defendants by Striking Their Answers and Entering Default Judgment in Favor of Plaintiff</u>.

Defendants have intentionally thwarted the search for the truth by committing various acts of misconduct through Plaintiff's Appeal Hearing and the instant case.

---

[11] Worley inexplicably admitted Cox's firing was in part related to his filing of a grievance in August 2022 regarding being passed over for consideration of the role of Battalion Chief. (<u>Id.</u>, pp. 90-91 (Q. "The grievance proceeding was insubordination in your view?" A. "It turned out to be that, yes." Q. "Okay. And that was part of the overall decision-making process and Chris losing his job. True?" A. "Yes.").

[12] A timeline of the key events discussed above is attached as Exhibit 28.

Defendants have testified falsely, concealed critical facts, falsified documents, threatened witnesses, and obstructed justice – coaching a witness – perhaps the most important witness in the case – while instructing him to destroy the evidence of the coaching.

"Generally, a district court may use its inherent power to enter a default judgment only if it finds, first, by clear and convincing evidence – a preponderance is not sufficient – that the abusive behavior occurred; and second, that a lesser sanction would not sufficiently punish and deter the abusive conduct[.]" Bailey v. Equifax Credit Info. Servs., Inc., 114CV00797MHCJCF, 2016 WL 11540113, at *5 (N.D. Ga. Nov. 28, 2016), report and recommendation adopted, 1:14-CV-797-MHC, 2017 WL 10728913 (N.D. Ga. Jan. 9, 2017) (internal citations omitted). "The Eleventh Circuit has instructed that "[t]he severe sanction of a dismissal or default judgment is appropriate only as a last resort, when less drastic sanctions would not ensure compliance with the court's orders.'" Githieya v. Glob. Tel*Link Corp., 608 F. Supp. 3d 1290, 1329 (N.D. Ga. 2020) (internal citation omitted). See Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc., 561 F.3d 1298 (11th Cir. 2009) (internal citations omitted). See also Forsberg v. Pefanis, 634 Fed. Appx. 676, 679 (11th Cir. 2015) (emphasis added) (internal citation omitted) (held that striking of supervisor's answer to employee's complaint was appropriate sanction for supervisor's submission of false statement from coworker); Malautca v. Suzukimentor Corp., 148

F.R.D. 362 (S.D. Ga. 1991) (court struck defendants' answer for willful violation of the Court's order and entered a default judgment in Plaintiff's favor). "[C]ourts have the inherent power to "fashion an appropriate sanction for conduct which abuses the judicial process." Johnson v. 27th Ave. Caraf, Inc., 9 F.4th 1300, 1314 (11th Cir. 2021) (internal citation omitted). "A court may exercise this power "to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."' Id. (internal citation omitted).

"Sanctions based upon a court's inherent power are "most often invoked where a party commits perjury or destroys or doctors evidence."' Reid v. McDaniel, 1:18-CV-4154-MHC, 2020 WL 13574055, at *2 (N.D. Ga. Feb. 13, 2020) (emphasis in original) (internal citation omitted). "Fabricating evidence is "the most egregious misconduct" and constitutes "a fraud on the court."' Id. "While many default cases feature evidence destruction, alteration, or fabrication, … such misconduct often is encapsulated by perjury." Chemtall, Inc. v. Cit-Chem, Inc., 992 F. Supp. 1390, 1409 (S.D. Ga. 1998). "Perjury … is a serious offense that results in incalculable harm to the functioning and integrity of the legal system as well as to private individuals." United States v. Holland, 22 F.3d 1040, 1047 (11th Cir. 1994) (affirming defendant's conviction of perjury in a civil proceeding where defendant willfully made material statements under oath that he knew were false.).

A finding of bad faith opens the door for the court to use its inherent power to order sanctions. <u>Barnes v. Dalton</u>, 158 F.3d 1212, 1214 (11th Cir. 1998). "A party also demonstrates bad faith by delaying or disrupting the litigation…." <u>Barnes v. Dalton</u>, 158 F.3d at 1214; <u>Footman v. Cheung</u>, 2005 U.S. App. LEXIS 9865, *146 (11th Cir. May 27, 2005) (unpublished) (finding bad faith where interrogatory answers were contradicted by pleadings).

Courts have used the "ultimate sanction" in cases where "no lesser sanction will prevent the offending litigant from continuing to lie or distort the truth so pervasively that it 'prevent[s] the opposing party from fairly presenting his case or defense.'" <u>Nichols v. Klein Tools, Inc.</u>, 949 F.2d 1047, 1048 (8th Cir. 1991) (internal citations omitted). "[S]uch misconduct threatens the very integrity of courts, which otherwise cannot command respect if they cannot maintain a level playing field...." <u>Oniha v. Delta Airlines, Inc.</u>, 1:19-CV-05272-LMM, 2021 WL 4930127 (N.D. Ga. Sept. 13, 2021), aff'd sub nom. <u>Oniha v. Delta Air Lines, Inc.</u>, 21-13532, 2022 WL 580933 (11th Cir. Feb. 25, 2022).  A level playing field is critical to the adversarial system and "[t]hose who lie, evade and fail to tell the ***whole*** truth…enjoy the advantage over honest litigants." <u>Chemtall</u>, 992 F. Supp. at 1409 (emphasis added).

**B.**     <u>**Plaintiff Has Established By Clear And Convincing Evidence That Defendants Engaged in Bad Faith Abuses and that No Level Playing Field Existed Here.**</u>

Here, Plaintiff has established by clear and convincing evidence that Defendants engaged in bad faith abuses of the judicial process. Defendants threatened witnesses, coached witnesses, falsified documents, and actively worked to conceal discoverable documents harmful to their case. Defendants have fabricated evidence, committed multiple blatant instances of perjury, and obstructed justice by any objective definition. Thus, no level playing field existed here. The grave misconduct has caused significant prejudice to Cox. Cox has been required to spend two years and significant time and money to discover evidence that should have been provided as a matter of course. Plaintiff has been required to untangle perjured testimony, search and examine metadata, and worry that no employee witness's testimony will be free of the fear from obstruction or retaliation, eliminating any chance of a fair proceeding here. Cox lost his job and hundreds of thousands of dollars in past and future economic losses. And there is no way to know what other evidence or statements have been manipulated by Defendants. Perhaps the most glaring evidence of prejudice is contained in the unfavorable decision by the Hearing Examiner – a decision now known to be based on false testimony and an incomplete record.

Plaintiff further submits that Defendants' misconduct has resulted in substantial harm to the functioning and integrity of this Court. Plaintiff submits that the totality of Defendants' misconduct in this case requires that Defendants Answers be stricken and whatever other remedy the Court deems just given the circumstances.

## III.    CONCLUSION.

Plaintiff's motion to strike and for entry of default judgment should be granted.

This 22nd day of August, 2025.

OLIVER MANER LLP

P.O. Box 10186
Savannah, Georgia 31412
T: (912) 236-3311
F: (912) 236-8725
ghodges@olivermaner.com
bhunter@olivermaner.com
blingle@olivermaner.com
arasheed-britt@olivermaner.com

*/s/ William J. Hunter*
I. GREGORY HODGES
Georgia Bar No. 358925
WILLIAM J. HUNTER
Georgia Bar No. 141288
R. BENJAMIN LINGLE
Georgia Bar No. 390252
ASHLEIGH RASHEED-BRITT
Georgia Bar No. 233945
*Attorneys for Plaintiff*

THE HAWKINS FIRM, LLC

235 Peachtree Street, NE, Ste. 400
Atlanta, GA 30303
T: (404) 334-9970
F: (404) 334-9940
trisha@hawkinsfirm.com

*/s/ Trisha Earls*
TRISHA EARLS
Georgia Bar No. 472755
*Attorney for Plaintiff*

## <u>CERTIFICATE OF COMPLIANCE WITH FORMAT</u>

Pursuant to Local Rule 5.1, I hereby certify that the forgoing brief has been prepared in Times New Roman font (14 point) as permitted by Local Rule 5.1(C).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and complete copy of the foregoing, along with exhibits, have been served upon Defendants by filing with the Court's in the CM/ECF system and via email to counsel, in accordance with Local Rule 5.1, addressed to the following:

FREEMAN MATHIS & GARY, LLP
Michael M. Hill
100 Galleria Parkway, Suite 1600
Atlanta, Georgia 30339
mhill@fmglaw.com

THIS 22nd day of August, 2025.

OLIVER MANER LLP

P.O. Box 10186
Savannah, Georgia 31412
T: (912) 236-3311
F: (912) 236-8725
ghodges@olivermaner.com
bhunter@olivermaner.com
blingle@olivermaner.com
arasheed-britt@olivermaner.com

*/s/ William J. Hunter*
I. GREGORY HODGES
Georgia Bar No. 358925
WILLIAM J. HUNTER
Georgia Bar No. 141288
R. BENJAMIN LINGLE
Georgia Bar No. 390252
ASHLEIGH RASHEED-BRITT
Georgia Bar No. 233945
*Attorneys for Plaintiff*

THE HAWKINS FIRM, LLC

235 Peachtree Street, NE, Ste. 400
Atlanta, GA 30303
T: (404) 334-9970
F: (404) 334-9940
trisha@hawkinsfirm.com

*/s/ Trisha Earls*
TRISHA EARLS
Georgia Bar No. 472755
*Attorney for Plaintiff*